Good morning. May it please the court, Charles Carrion, or Appellant, and I'm reserving respectfully four minutes for rebuttal. Thank you. When the court sits in equity, it speaks with the conscience of the court, and the doing of justice is uppermost in its mind. When a district judge crafts rules that direct mandatory conduct, those rules must be clear and ambiguous, and such were the words of the injunction that Judge Sharp initially imposed on Mr. Swade when he directed Mr. Swade to redesign his guitar headstocks so they would no longer be identical or confusingly similar to those of FMIC Fender. Mr. Swade followed those instructions and crafted new headstock designs that have been submitted in evidence and should be with the court now in Cincinnati. And what we're saying here today is that those Swade redesigned headstocks should have been and should in the future be judged against the standard that Judge Sharp initially imposed in mandatory language. That has never been done, because in the enforcement proceeding in March 2017, Judge Sharp deleted this language from the consent decree at the urging of Fender's counsel, who thus led the judge into reversible error. Judge Sharp committed factual and legal reversible errors, as he put it in the record, by deleting language from the agreement. From the consent decree. As some sort of circle... Now, Colvin, this is Judge Rogers' counsel. Yes, Your Honor. I thought that in your reply brief, you agreed that we had no jurisdiction over an appeal from the April 7, 2017 order. Is that not correct? Yes, Your Honor, that is correct. Under established law, there seems to be some about in other circuits, but not in this one. So how is the argument that you're making right now relevant to us? Yes, Your Honor. I believe that it is the analysis that was presented to Judge Crenshaw in the Rule 60B motion, and what would appropriately have been done by Judge Crenshaw in the exercise of his discretion would be to look and see whether the points that were raised in the Rule 60B motion were in fact valid, and these are the points that were presented there, Your Honor. Thank you, counsel. This is Judge Rogers again. Did the district court reach the merits, or did it say the motions were out of time? It did both, Your Honor. It's my understanding that it did both, and it both found that there was a time problem, and then it said, but even if, in the alternative, even if we consider it, and then Judge Crenshaw echoed the opinion of Judge Sharp and said, this is entirely a problem of Swade's own making because he agreed to this language. So you have to win on both of those issues in order to make the argument that you're making today? I think Mr. Swade earns a merited reversal by showing that when Judge Crenshaw reviewed and adjudicated his 60B motion, in which I personally admitted error in not calling Swade to the stand, testifies to the true meaning of the consent decree, and that His Honor, Judge Crenshaw, had a duty to exercise his discretion by considering those one proper way for that discretion to be exercised, which would be to consider the questions that were raised in the motion to wit. Was the proper standard applied? Was it fair to construe the agreement this way? Is it consistent with the intentions of the parties? Or was His Honor correct? I don't think that Judge Crenshaw dealt with those issues. I think there is a discretion there. And for that reason, it should be reversed because if discretion had been properly exercised, the court would have seen through to the essentially inequitable result that was reached here by eliding or frankly deleting the language of Section 2E and substituting for it the language for 2B that was actually applicable only to a narrow range of marks, and clearly, by its own terms, was not applicable to the guitar headstocks that were subject to the mandatory language. Pardon me. This is Judge Rogers again. How do you deal with the finding that as a Rule 60 motion it was untimely? Your Honor, I think that it was timely because it was discretionary. That was an exercise of discretion. And I think that the proper exercise of discretion, I may not have articulated this sufficiently in the brief, for which I apologize if that's the case. Wouldn't it normally be untimely Rule 60 motion if it was used as a substitute for an untimely appeal? If you wait until the appeal time expires and then you bring a Rule 60B motion, not on the basis of anything that's happened in between, but purely on the fact that the court was erroneous the first time around, doesn't that contemplate? Your Honor, I think that in this case that we have something more. And that something more is, unfortunately, my candid and timely admission of an act of excusable neglect. Which I think, if FMIC is correct, and I should have understood that the danger that was present here for Mr. Suede was that this confusingly similar language was going to be deleted and he was going to be hard not to. And I still missed it. And I think that is the definition of excusable neglect. And I think it's also a definition of excusable neglect. You're talking about neglect before the hearing? Or are you talking about neglect after the decision? At the hearing. At the hearing, primarily, Your Honor, in appearing there and not realizing that Mr. Suede's rights were on the chopping block and Section 2E was about to be elided, and he was about to be basically sentenced to a lifetime of not being able to practice his guitar, I couldn't face the man knowing that I was going into that mistaken position. If that was the case, then I think that was an error which completely takes it outside the scope of appeal and places it squarely into Section 2B. And I also think that my being standing there in the courtroom and not turning around to see if my client wanted to take the stand to rebut the judge's assertion that he had agreed to the Section 2E language, I don't think that that's a matter that could be raised on appeal either. I have not made it a practice of finding myself in error. Yes, Your Honor. Pardon me, counsel. This is my question. No, excuse me. Assuming all of that, there's a lot to assume, but assuming all of that, the decision was either reversible on appeal or not based on all of that at the time it was entered, right? My question is, why isn't the reasonable time less than the appeal time? Because if you allow a reasonable time to challenge what you can challenge on appeal, then you're just turning Rule 60 into a way to get around the failure to file a timely appeal. Do you see my concern? It doesn't relate to anything that happened before April 7th. I'm only talking about what happened after April 7th. Yes, Your Honor. And I hesitate to respond in this way, but I think the honest way to respond, which is that I believe that the court sitting in equity has a duty not only to the parties, but also to the institution and to the court to make sure that when this decision goes back to the district judge, that the district judge can do justice prospectively, because this is an extremely weighty matter. And this is not to say that procedural matters such as the court addresses can be brushed aside. I don't intend to do it. However, in all candor, I don't have a ready scholarly answer for that question. I simply feel... Thank you. Based upon 30 years of practicing as an advocate, that when on that rare occasion, when an advocate does come forward and say, Your Honor, I'm disclosing serious error of my own. And it begs the court to apply its discretion to consider whether my error should be visited upon my client. That's a very serious thing. And I think that this court can indeed find a way, because of the gravity of the nature of the rights that are infringed here, that the court can find a way to remedy it, to send this back so that Mr. Suede can get his first bite at the apple. And so that the district courts in the future can implement a reasonable order that can be implemented, because otherwise there are tremendous prospective issues in terms of enforcing it. And I think that those... Counsel, this is Judge Batzelder. If you want to reserve your four minutes of rebuttal time, your time has expired. Thank you, Your Honor. I appreciate your advising me of that. I will stop now. Mr. Davis, when you're ready. May it please the court. My name is Theodore Davis, and I represent the appellee in this matter, Fender Musical Instruments Corporation. Mr. Suede's appeal amounts three challenges to three actions taken by the district court, and each of those challenges is without merit. The first challenge is to the district court's finding that Mr. Suede was in contempt of its final injunction and in breach of the party settlement agreement, on both of which the is not, as Mr. Suede's counsel has just suggested, a case in which the district court imposed an injunction on Mr. Suede, nor has Fender ever requested the deletion of any language from that injunction. The second challenge is to the district court's denial of Mr. Suede's motions for reconsideration and for a new trial, which were filed five months and seven months after the contempt order, respectively. And finally, the third challenge is to the district court's mandatory fee-shifting provisions contained in the final injunction and the settlement agreement, but that challenge depends in its entirety on Mr. Suede's challenge to the contempt finding. With respect to the first of these, Mr. Suede's challenge to the contempt order is not properly before this court, and therefore need not and cannot be considered. As Judge Rogers has correctly observed, page four of Mr. Suede's reply brief concedes the absence of appellate jurisdiction over the contempt order. In light of that concession, Fender doesn't want to belabor the point, but it's worth noting the breadth of the arguments covered by the absence of appellate jurisdiction. This means that the arguments in Roman numeral sections three, four, five, six, seven, and eight of Mr. Suede's opening brief and Roman numeral sections two, three, four, five, six, and seven of his reply brief are not properly before this court. But equally to the point, Mr. Suede has waived a number of those same arguments by failing to raise them before the district court. These include the arguments in Roman numeral sections three, four, five, and 10.C of his opening brief. They also include the arguments in Roman numeral sections two, three, four, five, six, and eight of his reply brief, many of which were raised for the first time in that reply brief and not even in his opening brief. And in particular, the arguments waived below include the assertion that Mr. Suede's claimed lack of familiarity with the terms of the injunction constitutes a mistake within the meaning of rule 60B1, which he briefed for the first time on pages 50 and 51 of his opening brief before this court. His argument before the district court was that the district court had made a mistake within the meaning of that rule. And the waived arguments also include the claim you've just heard, which is that the allegedly excusable neglect of Mr. Suede's counsel is a basis for relief under rule 60 because the first time he actually briefed that issue is on page six of his opening brief before this court. Although Mr. Suede's motion for a new trial before the district court was accompanied by a declaration by his lead counsel raising the possibility of excusable neglect on his part, the significance of that possibility went completely unaddressed by the motion, its supporting brief, and its reply brief. But to respond to a point that Mr. Suede's counsel attempted to make a few minutes ago, both the settlement agreement and the consent injunction in this case contain several prohibitions on Mr. Suede's conduct. Among them is a two-tiered mechanism for addressing Mr. Suede's chronic copying of the headstocks incorporated in Fender's guitars, some of which are registered trademarks of Fender's and others of which are not. With respect to Fender headstocks that do not qualify as protectable trademarks, paragraph 2E of the injunction requires Mr. Suede to redesign his own headstocks so they are not likely to be confused with Fender's headstocks. But with respect to the Fender headstocks that do qualify as protectable trademarks, paragraph 2C of the injunction prohibits Mr. Suede from using headstocks in any way similar to those marks. Neither of these provisions prevents Mr. Suede from plying his trade as a luthier. To the contrary, as the record reflects, he has myriad alternative headstocks available to him, but he has simply chosen not to avail himself of those alternatives. The injunction... On page 32 of your opponent's brief, he says that the order interpreted the way that the district court below interpreted it, restraints Suede from seeking employment from any company that manufactures guitars that are in some way similar to FMIC guitars. So it's a little bit... It's saying not only does it keep him from making or designing guitars that are in some way similar to FMIC guitars, it also restrains him from working for any company that manufactures guitars within that broader... You'd concede it's a broader definition. I gather that's your whole point, really, is that it's a broader definition than confusingly similar. And if that's true, does it still restrain him or not? Your Honor, it is a broader standard, and this is one of the arguments over which this court does not have jurisdiction. This constitutional right to work theory is also one that has been asserted for the first time on appeal and is also not before this case. The injunction prevents him... I took you to be making some arguments that just in case we had jurisdiction. Otherwise, I'm not sure why you just made all those arguments you just made, and I wanted to ask you about that. I'm sorry, Your Honor. I'm trying to... Well, now I'm trying to respond to Your Honor's question. My question dealt with your argument where you were taking his... You were sort of assuming that we have jurisdiction and going through and saying why the broader interpretation applied. And I'm just wondering how far it does apply. Does it apply to sway from seeking employment from any company that manufactures guitars in some way similar to FMIC guitars? He states that in bold in his brief. Is that accurate or not? He does state that. It does not track the language of paragraph 2C of the injunction, which requires him personally and his company, which also is a party to this case and the injunction, shall completely cease using directly or indirectly, and it goes on from there. It does not prohibit... Under your interpretation, you would say that the order does not restrain him from seeking employment for a different company that manufactures guitars that are in some way similar to FMIC guitars. Your Honor, there is nothing in the injunction that prohibits him from doing that. There is nothing in the court's injunction, the district court's injunction, suggesting that interpretation. Thank you. That's my question. Thank you. Continuing to address the two-tiered structure of the injunction in the settlement agreement, this is not an unintentional or an... It's neither unintentional or an accident of drafting. It also is incorporated in the party's settlement agreement, and because there's no dispute that Fender's contempt motion sought to enforce Fender's rights to the registered marks reproduced on pages four and five of its brief, the district court did not err in holding Mr. Sway to the language of paragraph 2C of the injunction, which prohibits imitations of registered headstocks, and to reiterate, that prohibition reaches headstocks that are anyway similar. It also is undisputed that both well before and during the contempt proceedings, Fender repeatedly notified Mr. Sway that it intended to seek relief under the in any way similar standard, and those notifications took the form of email communications, statements in Fender's opening brief before the district court, which even italicized those words, Fender's reply brief before the district court, which characterized Mr. Sway's compliance with the standard as the sole question raised by Fender's motion, Fender's expert witness report, which opined that Mr. Sway had violated the in any way similar to standard and referred to that standard an additional 29 times, Fender's supplemental brief between the two hearings, which argues in italicized language that, quote, the in any way similar to standard is a standalone basis for liability, unquote, in Fender's arguments at both hearings, which repeatedly referenced that standard. In these repeated references, Fender's reliance on that standard preclude any determination that Chief Judge Crenshaw abused his discretion by holding that Mr. Sway had not suffered a deprivation of his Fifth Amendment right to due process. To the contrary, as Chief Judge Crenshaw properly concluded, Mr. Sway had the opportunity to file a brief and a sworn declaration in opposition to that motion. He presented expert witness testimony over Fender's objections. The district court held two separate hearings, and in each hearing, Mr. Sway's lead counsel presented extensive argument. At the second hearing, his lead counsel cross-examined Fender's And Mr. Sway himself could have testified at either hearing, but his two attorneys strategically chose not to put him on the stand. And the district court therefore did not abuse its discretion in recognizing that Mr. Sway had an ample opportunity to be heard. But the repeated notices of Fender's reliance on the in any way similar to standard also preclude any determination that Chief Judge Crenshaw abused his discretion by rejecting Mr. Sway's claim of surprise under Rule 60B1. Had Fender placed its references to that standard before the district court and Mr. Sway in an overly subtle or disingenuous fashion, constituting surprise within the meaning of the rule, those references would have been lost on the district court, which received far less notice than did Mr. Sway and his counsel. But the record shows that Chief Judge Sharp not only arrived at both hearings on Fender's motion well aware of what Fender's argument was, he warned Mr. Sway and his two lawyers on five separate occasions in open court that they were arguing the wrong point. Of equal importance, both Mr. Sway and his lead counsel submitted declarations to the district court confirming their awareness no later than the first hearing of Fender's reliance on that standard. And even if the claim by Mr. Sway's lead counsel to have been surprised at the first hearing is credible and Fender submits that claim as open to question, there is nothing excusable or nothing surprising, nothing he should have been surprised about at the second hearing. And specifically, despite his admitted knowledge of Fender's theory of contempt, Mr. Sway's counsel failed in connection with the second hearing to address that theory in a pretrial submission, in his oral argument, in preparing his expert witness, in his direct examination of that expert witness, in his cross-examination of Fender's expert witness, or in testimony from his client. Indeed, the district court had to warn him again at the second hearing he was arguing the wrong point. But equally to the point, mere attorney error is not a basis for relief under Rule 60. Mr. Sway's brief cite three cases for this proposition and each one of them either is an apposite or reaches the contrary holding. Lewis v. Alexander, an opinion from this court, reported at 987 F. Second 392. The underlying error was actually by the district court's clerk's office, which failed to docket a timely notice of appeal and the only error by the attorney at issue was counsel's failure to recognize the district court's mistake. Moreover, the only relief authorized by that opinion was a vacay tour and reentry of the district court's judgment, which has not been requested here. The second case is Tanner v. Yukins, reported at 776 F. Third 434, and it has nothing at all to do with attorney error, mistake, or surprise. It arose instead from a Rule 60 B. Six motion based on prison guards preventing the appellant from noticing a timely appeal. And finally, there's the case F. H. C. Equities, reported at 188 F. Third 678, and all the court need know about that opinion is the statement, and I'll quote here, plaintiff does not point us to a single case, however, which holds that an attorney misinterpretation of the law can constitute a mistake under Rule 60 B. One, and the same is true of the party's pleadings in this case. And finally, Chief Judge Crenshaw did not abuse his discretion by rejecting Mr. Swade's claims of misconduct by Chief Judge Sharp and by Fender's counsel. The allegations against Chief Judge Sharp are so baseless that Mr. Swade has understandably not pursued them on appeal, but the allegations against Fender's counsel are equally baseless. To prevail on a Rule 60 B. Three motion on the theory that the opposing party has perpetuated a fraud on the court, the movement must demonstrate by clear and convincing evidence a deliberate act adversely affecting the fairness of the relevant legal proceeding. Here, Fender did nothing more than invoke a standard expressly memorialized in two separate documents executed by Mr. Swade and his counsel. Fender did that in a completely transparent way. Indeed, after repeatedly advising Mr. Swade of its intention to pursue a contempt motion, Fender circulated its motion in supporting papers to Mr. Swade two months before formally filing and serving them. This therefore is not a case of Fender hiding the ball from Mr. Swade. It's instead a case of a deliberate decision by Mr. Swade's two lawyers not to respond to the arguments repeatedly and conspicuously placed in front of them. This court therefore should dismiss Mr. Swade's challenges to the contempt order for want of appellate jurisdiction, and it otherwise should be dismissed. Rebuttal? Yes, Your Honor. I'd like to begin with the statement by Mr. Davis that Mr. Swade and his counsel were put on notice that there was a risk that the Section E language was to be deleted from the consent decree, in effect, by the enforcement order. If the court reviews the record at the close of the hearing, of the show-caused hearing where Mr. Swade and his counsel had submitted an export declaration which, as Mr. Davis notes, repeatedly recited the confusingly similar standard at the conclusion of that hearing, and this was stated in my declaration in support of the 60B motion, counsel had a colloquy with the court in which the court said that it saw no confusing similarity between the Stratocaster headstock and Mr. Swade's AVRS design, and that with respect to the comparison between the AVRT design and the Telecaster, there might be some likelihood of confusion, and at that point, counsel for Mr. Swade said to the court, so then are we in the clear on the Stratocaster? And in fact, the judge said, no, I'm not ready to say that. However, the court did convene the next hearing for the contempt and said that at that time the court wished to hear expert testimony on the issue. The court did not request, in the mind of Swade and his counsel, the court was not requesting expert testimony because it wanted to apply a standard that would be so broad as to make expert testimony useless, which is what the in any way similar standard does. If the court had intended to apply the in any way similar standard, it could have done so immediately because, as the record will show, when Judge Sharp pressed Mr. Larson during his examination on the stand in the March 2017 contempt hearing, when he pressed him on whether there was any similarity between Swade's headstocks and those of FMIC, at that point, he virtually becomes mute. He virtually has no opinion to offer and simply concedes that, well, everything is similar in some way. So there was substantial reason for Swade and his counsel to go forward thinking that their prior briefing and their prior understanding of the issues presented by the court were very simple. The simple rule was, are we going to show both headstocks or are we going to show a lack of confusing similarity and be in the clear on one or both? And no further issues were, in fact, contemplated. And I'd like to address the next issue, which is the statement that vast chunks of the brief are irrelevant. I would note that the 14th Amendment portion of the brief is perhaps the most important, and that claim was certainly reserved at the Rule 60B stage. And that remains extremely important, the constitutional claim that this court may not, by its orders, infringe a constitutional right to employment. And I strongly disagree. Counsel, this is Scott Rogers. Could I ask one last question? Certainly, Your Honor. You're talking about the judge in the second of the two hearings not having informed you that the, in any way, similar standard would be used. That's correct, Your Honor. But your opponent's brief on page 14, I didn't go and check his sites, but he quoted four different places at the end of the previous hearing where Judge Sharpe said, we're going to use the, in any way, similar standard. Aren't we talking now about whether we're going to use any way similar? In order to comply, it can't be in any way similar, right? The language of the judge... Your Honor... Go ahead. All I can... Please excuse me for stepping on your words. All I can say is that, in the 30 years, nearly 30 years as federal advocate in the trial court, that I genuinely, and as I swore in my declaration, I did not leave that hearing with that impression. And where I questioned... I understand that. Pardon me, but are the quotes correct or are they not correct? I do not... They do not add up to what Mr. Davis contends. Because as we were walking out of the courtroom, I literally said to Judge Sharpe, are we in the clear on the Stratocaster because you have expressed this opinion that there does not appear to be any confusing similarity? Maybe I was irrationally pinning hopes on it. In which case, Your Honor, I think that's excusable neglect. But in no way did we prepare to adjust our argument to deal with the possibility. Because if we had, Your Honor, I wouldn't have gone to that hearing. I would have settled this matter in some fashion. It would have been utterly imprudent to go to that second contempt hearing and be judged under that standard. It would have been imprudent for me to have ever allowed Mr. Swade to agree to that consent decree that would have that effect. It's just... It is utterly job disabling. And before my time expires, Your Honor, I must say that this order will definitively disqualify Mr. Swade from employment in any place. I have obtained trademark orders, injunctions, and whenever it has appeared that there was a potential violation by way of a defendant who might go to work for someone else and commit infringements in that location of their existing consent decree, it is simply a matter of delivering a copy of that injunction of that enforcement order to the new employer, and that person will not be hired. He will be fired. Your opposing counsel has agreed that it doesn't extend that far. Can't you just rely on that? No, Your Honor. How can we? We cannot rely even on that word. We can't just go into court and you say judicial estoppel. No, I... Well, that may very well be so, Your Honor, and that may sound like an easy answer, but for a man who can barely obtain counsel, and when he obtained counsel, he gets me. This is not a simple answer. And furthermore, FMIC has been in bad faith, Your Honor. I negotiated disagreement with Mr. Davis, and I do not intend to cast aspersions in his direction. However, it was an entire shock to me when these contentions were made and followed up on, and if I was not astute in picking up on where we were headed, FMIC has also been extremely sharp in concealing its intention to take Mr. Swade to a place where he becomes fundamentally unemployable, and there is no way... Yes. Counsel, I think you're headed down a road here that is probably not appropriate, and in any event, your time has expired. Thank you very much, Your Honor. Thank you. The case will be submitted. Thank you. That is all for both counsel to please disconnect from the conference call. I'll just remind Your Honors that if you need to contact the operator, please press star zero. If you can't hear one of your colleagues, they can verify that they are still on the line or have been disconnected. Your Honors, do you require anything further? No. At this point, if you will make sure that the only ones on the line are the three of us, we will appreciate it. I absolutely will. Samantha, can you please assure the judges that once I hang up, no one else will be on the line? Yes, ma'am. I sure can. Thank you very much, and all of you please have a good afternoon. Thank you, Janine. We appreciate your help. Thank you. You're welcome.